NONPRECEDENTIAL DISPOSITION

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Submitted August 17, 2021[*]
Decided August 17, 2021

**Before**

MICHAEL S. KANNE, *Circuit Judge*

DAVID F. HAMILTON, *Circuit Judge*

MICHAEL B. BRENNAN, *Circuit Judge*

No. 20-2062

| | |
|---|---|
| KEITH JACKSON, <br> *Plaintiff-Appellant,* | Appeal from the United States District Court for the Eastern District of Wisconsin. |
| *v.* | No. 17-cv-194-pp |
| PATRICK MURPHY, et al., <br> *Defendants-Appellees.* | Pamela Pepper, <br> *Chief Judge.* |

### O R D E R

Keith Jackson, a Wisconsin prisoner, alleged that officials at Oshkosh Correctional Institution were indifferent to his medical conditions that later required surgery. The district court entered summary judgment because the undisputed evidence showed that the prison doctor had reasonably chosen a conservative treatment plan until he approved the surgery. Because we agree that no reasonable factfinder could determine that Jackson's care was constitutionally inadequate, we affirm.

---

[*] We have agreed to decide this case without oral argument because the briefs and record adequately present the facts and legal arguments, and oral argument would not significantly aid the court. FED. R. APP. P. 34(a)(2)(C).

Jackson's claims center on a three-year period during which Dr. Patrick Murphy treated him for a noncancerous testicular cyst. Jackson developed the cyst sometime before he was transferred to Oshkosh in 2010. He testified that he complained of pain as early as 2011; Dr. Murphy, though, first treated the cyst in 2012. At that time, Dr. Murphy continued Jackson's pre-existing prescription for a scrotal support and increased the dosage of pain relievers he was already receiving for chronic abdominal pain. Jackson found these steps inadequate and requested the cyst be removed. After a year of trying different combinations of medications, Jackson reported no decrease in pain despite an ultrasound showing little change in the cyst, so Dr. Murphy referred him to a urologist. According to the urologist, Jackson demanded the cyst be removed, but she concurred with Dr. Murphy's decision to manage Jackson's symptoms rather than attempt a surgery that was not guaranteed to relieve his pain, and that could even have increased it. The urologist recommended referring Jackson to a pain clinic; Dr. Murphy approved, and Jackson visited the clinic in November 2013.

Staff at the clinic believed that Jackson's pain might have been neuropathic rather than related to the cyst, but investigation of that theory was stymied by another of Jackson's conditions—severe nasal congestion later linked to a deviated septum. Dr. Murphy scheduled an MRI in December 2013, but the test was canceled because of Jackson's difficulty breathing. Dr. Murphy diagnosed him first with an upper respiratory infection, then allergies, and prescribed Jackson nasal spray, a sinus cleaning kit, and various medications. Meanwhile, Jackson saw the urologist again and this time she recommended surgery—though she again warned that it could worsen his pain. Dr. Murphy decided against surgery until an MRI could be conducted to rule out neuropathy.

While Jackson's congestion cleared, Dr. Murphy started treating Jackson's pain with steroid injections. In May 2014, Jackson was able to undergo the MRI, which showed no abnormalities. Ultrasounds that summer also showed the cyst had not grown significantly over the years, but Jackson continued to report no improvement despite the steroid injections and more adjustments to his medications. Having exhausted non-surgical treatment options, Dr. Murphy authorized surgery to remove the cyst in early 2015. He also referred Jackson to an ear, nose, and throat specialist to resolve his lingering congestion before the surgery. The specialist diagnosed the deviated septum and suggested surgery if symptoms continued despite Dr. Murphy's treatment plan. They did continue, so in May 2015, Jackson had his septum repaired. The cyst was successfully removed a few months after.

Jackson later brought this suit under 42 U.S.C. § 1983. He alleged that Dr. Murphy and other members of the prison medical staff violated his Eighth Amendment rights by delaying surgery and mistreating his symptoms. He also asserted that various prison officials ignored his complaints of ineffective medical treatment. Defendants moved for summary judgment, and the district court granted that motion. In a detailed order, the court explained that, although Jackson disagreed with his course of treatment, no reasonable factfinder could conclude that it fell so far short of professional standards that it amounted to cruel and unusual punishment.

On appeal, Jackson urges that the record shows a material factual dispute over whether Dr. Murphy withheld effective treatment for his cyst and other conditions. He does not develop any arguments regarding the other defendants, who in any event he accused primarily of ignoring his complaints about Dr. Murphy.

We agree with the district court that no reasonable jury could find that Dr. Murphy was "deliberately, that is subjectively, indifferent" to Jackson's health. *See Johnson v. Dominguez*, No. 19-1727, 2021 WL 3123756, at *4 (7th Cir. July 23, 2021). Far from ignoring Jackson's symptoms, Dr. Murphy continually responded to Jackson's complaints, exercised his medical judgment in evaluating them with the help of specialists, and attempted a multitude of treatments. This sort of varied and responsive care does not support a constitutional claim. *Id.* at *5.

Jackson insists that Dr. Murphy knew that non-surgical remedies would be ineffective. He highlights one drug the doctor prescribed in October 2014 that he refused to take because it had previously failed to relieve his abdominal pain. But he has offered no evidence to suggest that this prescription departed substantially from acceptable medical judgment nor that it undermined the totality of the care he received. *See Lockett v. Bonson*, 937 F.3d 1016, 1023–24 (7th Cir. 2019). Although he expressed a consistent preference for immediate surgery over trying any of the varying options Dr. Murphy prescribed, the Constitution does not entitle Jackson to demand specific treatment. *See Harper v. Santos*, 847 F.3d 923, 928 (7th Cir. 2017).

Jackson contends that a jury could fault Dr. Murphy for persisting in his own treatment plan instead of relying on specialists. His argument rests principally on *Hayes v. Snyder*, 546 F.3d 516 (7th Cir. 2008), in which we recognized that a factfinder could infer deliberate indifference when a prison doctor did not know the cause of an inmate's symptoms and refused to refer him to a specialist for that reason. *Id.* at 526. But Dr. Murphy did not rebuff specialists, and indeed worked with several to diagnose and

treat Jackson. Perhaps, as Jackson argues, Dr. Murphy could have referred him sooner, but the decision to refer a patient to a specialist is itself an "exercise of medical discretion," that violates the Constitution only if a doctor's choice is "blatantly inappropriate." *Pyles v. Fahim*, 771 F.3d 403, 411 (7th Cir. 2014) (citation omitted). No reasonable jury could find that Dr. Murphy's decisions fit that bill. Dr. Murphy did not need the urologist to diagnose the cyst, and the urologist initially agreed with his treatment plan. And though only the ear, nose, and throat doctor diagnosed the deviated septum, Dr. Murphy's treatments were endorsed by that specialist and helped to rule out other possibilities, including the allergies that the specialist agreed were another potential cause of Jackson's symptoms even while recommending surgery.

Jackson also argues that Dr. Murphy should have approved the cyst removal as soon as the urologist recommended it in early 2014. Dr. Murphy, though, exercised his reasoned medical judgment in electing to await the outcome of the MRI and steroid injections first. Mere disagreement between medical professionals about the best course of action does not suggest deliberate indifference. *See id.* at 409. And the urologist and Dr. Murphy did not disagree much; the urologist acknowledged that surgery could have made things worse instead of better. This is strong evidence suggesting that Dr. Murphy's decision to try other options before surgery was reasonable. *See Howell v. Wexford Health Sources, Inc.*, 987 F.3d 647, 660 (7th Cir. 2021).

AFFIRMED